**ATLANTIC & GULF STEVEDORES, INC., et al., Petitioners,**

v.

**OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION, Respondent.**

No. 75–1584.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1976.

Decided March 26, 1976.

**544**

Francis A. Scanlan, Sean O'Callaghan, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for petitioners.

William J. Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Michael H. Levin, Counsel for App. Litigation, Scott H. Strickler, Dennis K. Kade, Attys., U.S. Dept. of Labor, Washington, D. C., for respondent.

## OPINION OF THE COURT

Before FORMAN, GIBBONS and ROSENN, Circuit Judges.

GIBBONS, Circuit Judge.

This is a petition filed pursuant to § 11(a) of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 660(a), to review an order of the Occupational Safety and Health Review Commission (the Commission) determining petitioners to be in non-serious violation of the Act's provisions. The petitioners are stevedoring companies operating in the Port of Philadelphia. They employ longshoremen. The Secretary of Labor, pursuant to statutory authority,[1] has adopted safety and health regulations for longshoring. Among those regulations is the so called "longshoring hardhat" standard:

> "Employees shall be protected by protective hats meeting the specifications contained in the American National Standard Safety Requirements for Industrial Head Protection, Z89.1 (1969)."

29 C.F.R. § 1918.105(a) (1975).

On April 10–11, 1973 an OSHA compliance officer inspected the Camden, New Jersey docks and discovered that nearly all of petitioners' longshoremen were working without hardhats.[2] The Secretary cited petitioners for violation of § 5(a)(2) of OSHA, 29 U.S.C. § 654(a)(2), and proposed that civil penalties aggregating $455 be levied against the petitioners.[3] Each citation also ordered immediate abatement of violations. Petitioners filed notices of contest, 29 U.S.C. § 659(a), which resulted in a hearing before the Commission's Administrative Law Judge. 29 U.S.C. § 659(c).

At the hearing the OSHA compliance officer testified that on the dates of his inspections, only a very small proportion of the longshoremen were wearing hardhats, that none of the petitioners had previously been cited for a violation of the hardhat standard, and that no injuries were involved. He also testified that between 1971, when the standard was adopted, and April 1973 there had been a moratorium in the Secretary's enforcement of it, because the longshoremen's unions opposed it and the rank-and-file preferred not to wear hardhats. In 1973 the Secretary changed his enforcement policy, apparently as a result of conversations between a representative of the Department of Labor and the president of the International Longshoremen's Association.

---

1. The regulations were adopted pursuant to the Longshoremen's and Harbor Workers' Compensation Act, Pub.L. No. 85–742, 33 U.S.C. § 941, and republished pursuant to OSHA, 39 Fed.Reg. 22074 (1974). Standards adopted pursuant to Pub.L. No. 85–742 are enforceable under OSHA. 29 U.S.C. § 653(b)(2).

2. The evidence tended to show that on these days only about 50 of 225 longshoremen employed by the petitioners and observed by the compliance officer wore hardhats on the job.

3. Because the alleged violations were not considered to have created "a substantial probability [of] death or serious physical harm", 29 U.S.C. § 666(j), the Secretary deemed them non-serious for civil penalty purposes. 29 U.S.C. § 666(c).

Witnesses for the petitioners testified that stevedores in the Port of Philadelphia had, beginning in 1971, undertaken strenuous but unsuccessful efforts to obtain compliance with the standard by their longshoring employees; had furnished the required hardhats; had encouraged use of the headgear at regular safety meetings; had posted hardhat signs on their working premises; had used payroll envelope stuffers advocating hardhat wearing; and had placed hardhat safety messages on the hiring tapes. All this was to little avail, and each employer witness testified to a firm belief that wildcat strikes or walkouts would attend attempts to enforce the standard by firing employees who refused to comply. There is undisputed testimony that in another port a strike over that issue did occur.[4] There is, however, no testimony that these petitioners ever denied work to a longshoreman for his refusal to wear a hardhat.

The petitioners urged that the Secretary's citations and proposed penalties should be vacated because in view of the longshoremen's intransigent opposition to and their union's lukewarm support for the standard, compliance *by them* with the hardhat standard was not achievable. The Administrative Law Judge found the three employers in violation of 29 C.F.R. § 1918.-105(a), but vacated the Secretary's proposed penalties. A petition for discretionary review was filed with the Commission pursuant to §,12(j) of the Act, 29 U.S.C. § 661(i), and review was granted.

4. This strike occurred in the Port of New York in 1970, prior to the enactment of OSHA. The record also disclosed that stevedoring companies have successfully enforced the mandatory use regulation in the Port of Norfolk, but that longshoremen in the Port of San Francisco have resisted the use of hardhats.

5. In rejecting a strict liability standard Commissioner Van Namee relied upon *National Realty & Constr. Co. v. OSHRC,* 160 U.S.App.D.C. 133, 489 F.2d 1257 (1973), which this court expressly approved in *Brennan v. OSHRC (Hanovia Lamp Div.),* 502 F.2d 946 (3d Cir. 1974).

6. That a *Boys Markets, Inc. v. Retail Clerks, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) remedy is available does

I

On April 11, 1975 the Commission handed down the decision and final order which we review. The Commission voted 2–1 to affirm the Administrative Law Judge's decision finding violations and vacating proposed penalties, but each Commissioner filed a separate opinion. Commissioner Cleary announced the decision of the Commission. He rejected as "largely speculative" the petitioners' contention that they had done all they could do without causing labor strife. In addition, citing *Brennan v. OSHRC (Gerosa, Inc.),* 491 F.2d 1340 (2d Cir. 1974), he concluded that, at least when non-compliance by employees was neither unpredictable nor idiosyncratic, final responsibility for compliance with the Act's requirements rested with the employers.

Commissioner Van Namee, concurring, did not agree that the evidence of potential labor unrest was speculative. Nor did he agree that employers could under the Act be held strictly liable in all instances of technical non-compliance.[5] Yet he concluded that in this instance the employers would, because of the terms of their collective bargaining agreements, have a remedy under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against a wildcat strike. Commissioner Van Namee surmised that the availability of such a remedy made the fear of a strike, or at least an effective one, "nothing more than an illusion."[6] He recognized, however, that the

not, of course, by itself conclusively answer petitioners' objection that employee recalcitrance makes compliance with the longshoring hardhat safety standard impossible. The stevedores could obtain a § 301 injunction only if they agreed to submit the hardhat dispute to arbitration. There can be no assurance, for example, that an arbitrator would decide that an employee who defied an express directive of his employer and ignored validly promulgated federal regulations could be discharged or otherwise disciplined for such conduct. We assume, however, that arbitration would most often sustain the employer prerogative in this regard. Where the collective bargaining agreement empowers the employer to seek § 301 relief, therefore, that remedy is likely to prove

applicability of a particular safety and health standard should not turn on whether the parties to the collective bargaining agreement agreed upon a grievance-arbitration procedure that was broad enough to permit a *Boys Markets* injunction. Such an approach would admit of selective enforcement of OSHA safety standards. To meet this objection Commissioner Van Namee said that irrespective of the existence of a *Boys Markets* remedy, the Commission itself had the statutory authority to issue cease and desist orders running against employees. These orders could be enforced by injunction in the Courts of Appeals pursuant to §§ 11(a) and (b) of the Act, 29 U.S.C. §§ 660(a) and (b).

Chairman Moran dissented. Like Commissioner Van Namee, he rejected Commissioner Cleary's assessment of the evidence concerning the likelihood of walkouts over attempts to enforce the hardhat requirement. He concluded that the employers had taken all steps required of them under the Act. He also expressed doubt as to the availability of § 301 injunctive relief.

In summary, although the Commission order affirmed the citations, there is no opinion which can be said to represent a concensus. Two Commissioners, Moran and Van Namee, agree that the record contains substantial evidence tending to show that a work stoppage will occur if the petitioners take additional steps to enforce the hardhat requirement. Commissioner Van Namee concludes, however, that the availability of relief before the Commission against spontaneous employee obduracy renders this body of evidence irrelevant. Chairman

Moran evidently does not share Commissioner Van Namee's expansive view of the Commission's powers, although he did not in this case address the issue. Commissioner Cleary flatly rejects any interpretation of OSHA that would permit the Commission to issue cease and desist orders against employees. Nevertheless, he regards the threat of work stoppages posed in this instance as largely speculative. In any event, Commissioner Cleary suggests that where, as here, employee non-compliance is neither unpredictable nor idiosyncratic, the employer has an absolute statutory duty to enforce the terms of the Act.

## II

Section 11(a) of the Act, 29 U.S.C. § 660(a), directs the reviewing court to accept "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole . . . ." *Brennan v. OSHRC (Interstate Glass Co.)*, 487 F.2d 438 (8th Cir. 1973). Because there is no opinion in which a majority of the Commission joined, there is no Commission finding of fact with respect to the likelihood that enforcement of the hardhat standard would provoke a work stoppage. But two Commissioners appear to have credited the testimony of the petitioners' witnesses that such a work stoppage was likely if not inevitable. We believe that such a finding would be supported by substantial evidence on the record as a whole.[7] Indeed, Commissioner Cleary's rejection of the evidence as "largely speculative", if it represented a finding of the Commission, probably would have to

---

adequate. In those instances where it is demonstrably inadequate, the employers may nevertheless seek relief from liability by petitioning for a variance from the standard, 29 U.S.C. § 655(d), or for an extension of time in which to abate a cited violation 29 U.S.C. § 659(c). *See* Part IIIB, *infra*.

7. In addition to the evidence of the employers' futile attempts at friendly persuasion, and of the longshoremen's resistance in the Port of Philadelphia and elsewhere, *see* Part I *supra*, the evidence showed that while initial compliance in 1971 with the regulation was good (about 80%), the rate of compliance quickly

deteriorated. Apparently many workers tried the hats, found them uncomfortable or cumbersome, and discontinued their use.

The evidence also showed that although the stevedores had never actually denied employment to a longshoreman who refused to wear a hardhat, a 1971 threat of such action triggered an angry demonstration of longshoring foremen. Statistics showing that head injuries comprised only a small fraction (perhaps 1%) of total longshoring injuries fueled employee sentiment that hardhats did not protect against a significant occupational hazard and hence were unnecessary.

be dismissed as unsupported by substantial record evidence. Thus we assume, for purposes of this petition for review, that the longshoremen in the Port of Philadelphia are intransigent on the hardhat issue and are likely to strike if more vigorous enforcement efforts are undertaken.

■ This assumption serves to focus the specific and relatively narrow issue presented by this petition, viz., whether when employee non-compliance with an occupational safety or health standard is both predictable and virtually uniform, the employer must nevertheless enforce compliance even at the risk of concerted employee work stoppages. Because any answer to this inquiry is an adjudicatory conclusion, the scope of our review is less narrowly jacketed than with factual determinations. The law of this circuit is that we may set aside such conclusions if we find them to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *Brennan v. OSHRC (Hanovia Lamp Div.),* 502 F.2d 946, 951 (3d Cir. 1974); *Budd Co. v. OSHRC,* 513 F.2d 201, 204 (3d Cir. 1975) (per curiam).

### A

■ In urging us to vacate the citations, petitioners place principal reliance on our decision in the *Hanovia Lamp* case. There we followed the holding of the District of Columbia Circuit in *National Realty & Construction Co. v. OSHRC,* 160 U.S.App.D.C. 133, 489 F.2d 1257 (1973), rejecting a construction of the Act which would effectively make employers strictly liable for violations arising from employee misconduct. In *Hanovia Lamp* we held that an employer could be held answerable for a violation resulting from such misconduct only when "demonstrably feasible measures" existed for materially reducing its incidence. 502 F.2d at 952. In reply the Secretary correct-

ly points out that both *National Realty Construction* and *Hanovia Lamp* involved citations for violation of the Act's general duty clause,[8] while this case involves a citation for violation of a specific safety standard.[9] It seems to be the Secretary's position that employers are to be held to a higher standard of care under specific regulations than under the general duty clause. We decline to bifurcate the statute in such a manner, and attach no significance to the proffered distinction. As the First Circuit observed in *Cape & Vineyard Division of New Bedford v. OSHRC,* 512 F.2d 1148 (1st Cir. 1975), the employer's task of guarding against the aberrational action of specific employees who violate specific safety standards is essentially no less difficult than under the general duty clause. *Cf. Brennan v. Butler Lime & Cement Co.,* 520 F.2d 1011, 1017 (7th Cir. 1975). Thus the *Hanovia Lamp* standard governing employer responsibility applies, in our view, to 29 C.F.R. § 1918.105(a) to the same extent as to the general duty clause.

But while *Hanovia Lamp, National Realty Construction* and *Cape & Vineyard Division* supply us with the standard of liability to be applied to the facts of this case, they offer precious little insight into the question whether the petitioner stevedoring companies have breached their statutory duty of care. Those cases involved the unpredictable and unforeseeable actions of individual employees. This case involves the predictable, nearly universal actions of all the longshoremen. There is a demonstrably feasible measure which can be taken to prevent such concerted disobedience: the employer can refuse employment to those who insist on violating the standard. The discussions of strict liability in the cases referred to have no application to the instant situation, except to the extent that they are authority for the proposition that we will not construe OSHA to impose com-

---

8. Section 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1), requires each employer to

 "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or seri-

ous physical harm to his employees . . ."

9. Section 5(a)(2) of the Act, 29 U.S.C. § 654(a)(2), directs each employer to

 "comply with occupational safety and health standards promulgated under [the Act]."

pletely unreasonable burdens on employers within the Act's coverage.

We find guidance on this difficult question in our recent decision in *AFL–CIO v. Brennan*, 530 F.2d 109 (3d Cir. 1975). In that case we reviewed action of the Secretary adopting a "no hands in dies" standard for the mechanical power press industry. We recognized that the economic feasibility of an occupational safety and health standard was relevant to our assessment of its statutory validity. We pointed out that an economically impossible standard would in all likelihood prove unenforceable, and that the burden of policing a regulation uniformly ignored by a majority of industry members would prove to be overwhelming. Thus we held that in promulgating regulations the Secretary could take into account the economic impact of a proposed standard. *See* 530 F.2d at 122–123; *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 477–78 (1974).

B

In the same case, however, we also recognized that OSHA must be viewed as technology-forcing legislation; that is, legislation looking to improvement in the techniques of industrial safety. *See* 530 F.2d at 120–122. The Secretary's rule-making task comprehends weighing the competing considerations of economic burden and improvement of safety. The approach we took in *AFL–CIO v. Brennan* suggests, although it does not compel, the conclusion that employee resistance to a safety standard having severe economic consequences is a relevant consideration in the instant case. That conclusion is not compelled because of the manifest differences between the Secretary's quasi-legislative rule-making, which we review under § 6(f) of the Act, 29 U.S.C. § 655(f), and Commission adjudication, which we review under § 11(a), 29 U.S.C. § 660(a). It is at least arguable that while the Commission may consider evidence bearing upon an employer's culpability for a given violation, it may not take into account the general economic

consequences of enforcement of the standard. Such a conclusion would not necessarily be inconsistent with *Hanovia Lamp* and the other § 11 cases recognizing that an employer is not to be held responsible, in an enforcement proceeding, for unpredictable and unforeseeable employee misconduct. It would relegate to the Commission the role of developing rules against harsh or arbitrary applications of standards in individual cases, while leaving to the Secretary the legislative task of making broad policy decisions.

That the issue before us involves broad policy considerations is abundantly clear. Indeed, the Secretary's moratorium on enforcement of the hardhat standard from 1971 to 1973 suggests that those considerations were at one time thought to be significant. But assuming that the respective roles of the Secretary and the Commission are as the foregoing discussion suggests, our role, whether the standard comes before us in the context of a § 6(f) petition or a § 11(a) enforcement proceeding, would appear to be the same. This conclusion follows from either of two diverging lines of analysis.

1

The two occupational safety and health bills reported out of the respective Labor committees to the floors of the House and Senate originally made no provision for an Occupational Safety and Health Review Commission. The Senate Bill, S. 2193, and the House Bill, H.R. 16785, each authorized the Secretary of Labor both to issue citations and propose penalties, and to adjudicate the question of liability in the first instance, subject to judicial review in the courts of appeals. Section 11(b) of the House bill described in some detail the procedures to be followed by the Secretary in these administrative adjudications, and concluded by directing that

"[i]n proceedings under this subsection, the Secretary shall consider, among other things, *the validity of any standard*, rule, order, or regulation alleged to have been violated, and the reasonableness of the

period of time permitted for the correction of the violation." (emphasis supplied).

See also H.R.Rep. No. 91–1291, 91st Cong., 2d Sess. 24, 41 (1970). Although the House bill did not provide for pre-enforcement adjudicatory review of standards promulgated by the Secretary, non-statutory pre-enforcement judicial review could be had under § 10 of the Administrative Procedure Act, 5 U.S.C. § 701–06. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Gardner v. Toilet Goods Association, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). It is thus clear that the House believed that administrative review of the substantive validity of a safety regulation in an enforcement proceeding was a beneficial and desirable complement to pre-enforcement review in the federal courts. The Senate bill expressly provided for pre-enforcement judicial review of a promulgated standard, and did not in terms authorize substantive administrative review in an enforcement proceeding.

■ Dissatisfied with an enforcement scheme that assigned to the Secretary of Labor responsibility both for issuing citations and adjudicating liability thereon, a minority in both the House and the Senate dissented from the majority reports and advocated that an independent commission be established to adjudicate citations brought by the Secretary. See H.R.Rep. No. 91–1291, supra, at 47–52; S.Rep. No. 91–1282, 91st Cong., 2d Sess. 54–57 (1970), U.S.Code Cong. & Admin.News 1970, p. 5177. Amendments creating the Occupational Safety and Health Review Commission were proposed and adopted on the floor. The House version also adopted the

Senate provision for statutory pre-enforcement review of any safety or health standard. Although neither the House bill as passed nor the Conference bill which ultimately became OSHA expressly authorized the Commission to pass upon the validity of standards brought before it for enforcement, it appears from the floor debates in the House that the Commission was established only to enhance the fairness of the enforcement proceeding by separating the executive and adjudicatory functions. See, e. g., Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970, at 980, 982, 991, 999, 1014–15, 1050, 1058, 1070–71, 1074, 1090–91. There is no evidence suggesting that the amendment curtailed in any way the nature and scope of inquiry at the administrative adjudicatory stage. We thus believe that as enacted, § 11(a) of OSHA carries forward, if only implicitly, the understanding of the House, reflected in the Committee bill, that the validity of a particular safety standard could preliminarily be determined in a Commission enforcement proceeding.[10]

■ This conclusion is supported by strong policy considerations as well as the Act's legislative history. As has been seen, § 6(f) provides for pre-enforcement review of a safety standard in the courts of appeals. The provision does not direct the court to expedite the reviewing process, however, so it is likely that there will be substantial lag time between the Secretary's promulgation of a challenged standard and the initial decision on its validity.[11] Because the filing of a pre-enforcement petition to review will not ordinarily operate as a stay of the standard, see § 6(f), 29 U.S.C. § 655(f), enforcement proceedings

---

10. Although nothing in S. 2193 or its several amendments can literally be interpreted as authorizing review of a standard's validity at the enforcement stage, there is no evidence that any Senator regarded the original House approach as inappropriate. For the floor debates, see Legislative History, supra, at 298, 306, 316, 320, 334, 337, 392–93,. 417–19, 424, 426–30, 435–38, 441–42, 446–47, 462–78.

11. See, e. g., AFL–CIO v. Brennan, supra (13 months). Compare Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), see infra, where Congress expressly expedited pre-enforcement review in the Emergency Court of Appeals and the Supreme Court of price-control regulations whose validity could not be challenged in enforcement proceedings. See § 204(c) and (d) of the Emergency Price Control Act of 1942, 56 Stat. 32.

**550**

may commence before even an initial determination of validity has been made. Unless the Commission is authorized to consider defenses of invalidity, it will be reduced to rubber-stamping possibly invalid citations, and employers will for an interim period be deprived of any remedy for sanctions imposed contrary to law.

■ Moreover, it may become evident that a particular safety and health standard is economically or technologically infeasible, or otherwise unreasonable, only after employers have made good faith efforts to comply. These problems may manifest themselves well after the 60-day period for pre-enforcement review has expired. The Commission would thus be the only available forum for raising the question of invalidity. Because we do not believe that Congress intended to foreclose all possible challenge to the validity of a standard 60 days beyond its effective date, we must conclude that § 11(a) of OSHA empowers the Commission to deny enforcement to a standard determined by it to have been issued in violation of the Act's substantive or procedural requirements.

■ Because judicial review of the Commission's adjudicatory conclusions is plenary, *see Hanovia Lamp, supra*; *Budd Co. v. OSHRC, supra*, once it is decided that the Commission has the authority to entertain defenses of invalidity in enforcement proceedings, it inescapably follows that the reviewing court enjoys a similar license. Thus whether a challenged standard comes before us in the context of a § 6(f) petition or a § 11(a) enforcement proceeding, we must inquire into its compatibility with the terms of the Act. *See Arkansas-Best Freight Systems, Inc. v. OSHRC*, 529 F.2d 649, 653 (8th Cir. 1976).

**2**

This same conclusion is reached by approaching the problem on a somewhat different tack. We readily recognize that there is authority for the proposition that Congress has the power to restrict judicial review of administrative rule-making to a particular mode or to a particular forum, and to withhold from a sanctioning court the power to review the validity of the underlying rule when the specified mode or forum has not been availed of. *See, e. g., Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Lockerty v. Phillips*, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943). We may therefore assume that Congress in enacting OSHA could, consistent with due process, have withheld our competence in an enforcement proceeding to entertain defenses raising the validity as applied of an occupational safety and health regulation. Power to decide questions of validity could thus be confined, in the first and final instance, to the court reviewing direct petitions. *But see Yakus v. United States, supra*, 321 U.S. at 478–81, 64 S.Ct. at 693, 88 L.Ed. at 877 (Rutledge, J., dissenting).

■ In light of the foregoing discussion, it can be argued that because Congress in § 6(f) of the Act authorized direct review in the courts of appeals of standards promulgated by the Secretary, and limited the period of review to 60 days, we are without authority to entertain an attack upon the validity of any regulation in a § 11 enforcement proceeding. But the Emergency Price Control Act of 1942, 56 Stat. 23, which the Court construed in *Yakus* and *Lockerty*, quite explicitly confined judicial review of the validity of price control regulations to the Emergency Court of Appeals.[12] There

**12.** Section 204(d) of the Emergency Price Control Act provided:

The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, *shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2*, of any price schedule effective in accordance with the

provisions of section 206, and of any provision of any such regulation, order, or price schedule. *Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act* authorizing the issuance of such

is no comparable direction in OSHA. Indeed, § 11(a), while confining judicial review of fact findings in enforcement proceedings to the substantial evidence standard, is entirely silent as to legal issues. We do not find, from the availability of limited pre-enforcement judicial review permitted under § 6(f) and the silence with respect to legal issues in § 11(a), an intention to limit the scope of judicial review in the enforcement proceeding. Judicial review at that stage is, after all, the ordinarily preferred method. *See Toilet Goods Association v. Gardner,* 387 U.S. 158, 163–64, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697, 701 (1967). Absent an explicit withdrawal of jurisdiction, we will entertain affirmative defenses attacking the validity of an administrative regulation that is brought to us for enforcement. In *Synthetic Organic Chemical Manufacturers Association v. Brennan,* 503 F.2d 1155 (3d Cir. 1974), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975) (*Synthetic Organic I*), a § 6(f) case, we set forth in detail the scope of our review of standards promulgated by the Secretary. In the face of Congressional silence the presumption of reviewability at the enforcement stage attaches. We therefore consider that the scope of our review in a § 11(a) case is co-extensive with a § 6(f) case.

■ That being the case, it seems illogical to suggest that the Commission cannot in the first instance adjudicate both the fact of violation and the validity of the implicated standard. Certainly it would be an exercise in futility for the Commission to enforce a citation under a standard which it knew, perhaps from prior adjudications, would be held invalid by this court. Moreover, the availability of judicial review to the Secretary under § 11(b) of the Act, 29 U.S.C. § 660(b), suggests that the Commission has such power. Because the Secretary is much more concerned with the validity of a standard than with questions of individual liability, we interpret § 11(b) as

essentially a vehicle for the Secretary to obtain judicial review of the Commission's legal conclusions generally, and particularly its adjudications regarding the validity of a specific safety and health regulation.

C

■ We hold today that we have jurisdiction to decide the validity of an OSHA regulation in an enforcement proceeding as well as in a direct petition for review. We do not mean to suggest, however, that the posture in which the question is presented to us is irrelevant for all purposes. Indeed, the context in which the challenge to a regulation is made determines the allocation of the burden of proof.

■ *Synthetic Organic I, supra,* established a five-step process for judicial review under § 6(f) of OSHA standards. The court held that the Secretary carried certain minimum burdens that must be satisfied before a promulgated standard could be sustained. These included notice of the proposed rulemaking, and the preparation of a statement setting forth the reasons for the action. 503 F.2d at 1160. It is clear, then, that in a § 6(f) proceeding the Secretary has an affirmative burden to demonstrate the reasonableness of an adopted standard.

■ Congress barred petitions for § 6(f) review filed more than 60 days after promulgation. We have already held the defense of invalidity is always available in an enforcement proceeding. But we do not believe that the burden of proof in a § 11(a) case is identical with the burden in a § 6(f) case. In an enforcement proceeding invalidity is an affirmative defense to a citation, and the petitioning employer bears the burden of proof on the issue. Thus a petitioner cannot defend solely on the ground that the procedural requirements established in *Synthetic Organic I* have been ignored by the Secretary. To carry its burden the petitioner must produce evidence showing why the standard under review, as applied to it, is

regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule,

or to restrain or enjoin the enforcement of any such provision.
56 Stat. 32 (emphasis supplied).

arbitrary, capricious, unreasonable or contrary to law. Were we to hold otherwise we would effectively nullify the congressional circumscription of the right to petition for review of an OSHA standard.[13]

### III

In this case the petitioners contend that the longshoring hardhat safety standard, insofar as it is applied to them, is invalid because attempts at enforcement would provoke a wildcat strike by their employees. The standard is, in their view, economically infeasible. They produced evidence tending to support this position in the proceeding before the Administrative Law Judge. We believe that petitioners have carried their burden of proof on the issue. The remaining question is the legal sufficiency of the defense. We turn, then, to the several grounds relied upon by the Commission in rejecting petitioners' challenge to the hardhat safety standard.

### A

If Commissioner Van Namee is correct that the Commission has the power to issue cease and desist orders against employees as well as employers, then the economic infeasibility argument against the standard disappears from this case. Unlike the no hands in dies standard which we reviewed in *AFL-CIO v. Brennan, supra,* the infeasibility claim in this case is bottomed not on the cost of forcing the technological change, but on the cost of a work stoppage caused by employee discontent with a simple, inexpensive and facially reasonable safety standard. If the Commission, and in turn this

court, can issue coercive process against employees directly, the threat is eliminated and the defense overcome. It is far from clear, however, that the Commission enjoys the power for which Commissioner Van Namee argues.[14]

Commissioner Van Namee finds the source of such coercive authority in a combination of § 2(b)(2) of the Act, 29 U.S.C. § 651(b)(2), § 5(b), 29 U.S.C. § 654(b), and § 10(c), 29 U.S.C. § 659(c). The latter provision authorizes the Commission to issue orders "affirming, modifying, or vacating the Secretary's citation . . . or directing other appropriate relief . . . .." Section 2(b)(2), in the section of the Act setting forth congressional findings and a declaration of policy, provides:

> (b) The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—
>
> . . . . .
>
> (2) by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions . . . .

Section 5(b) provides that

> "[e]ach employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this chapter which are applicable to his own actions and conduct."

According to Commissioner Van Namee the employees' separate responsibilities un-

---

13. We recognize that in dealing with difficult and complex problems of economic and technological feasibility, the placement of the burden of proof may well be determinative of the question of validity. A standard which, because of the placement of the burden of proof, could not be sustained in a § 6(f) proceeding, may nonetheless be held valid in an enforcement proceeding where the burden shifts to the party asserting invalidity. Whether such an approach is wise is not for us to decide. We believe that Congress, by limiting § 6(f) review to 60 days, has directed employers to be vigilant by raising questions of invalidity prior to actual enforcement.

14. The Secretary argues that it is unnecessary, indeed inappropriate, for us to decide this issue which was not in terms raised by the parties below. *See* 29 U.S.C. § 660(a). The Secretary has prosecuted this case on the theory that the longshoring hardhat safety standard is valid, and petitioners have defended on the ground that it is void as infeasible. Whether the Commission has the statutory authority to issue cease and desist orders against employees goes to the heart of the feasibility controversy. We believe that it is both necessary and appropriate to decide this purely legal question.

der § 5(b) would be "meaningless and a nullity" if the Commission and this court, in an enforcement proceeding, were powerless to sanction employee disregard of safety standards and commission orders.

In the proceedings before the Commission, the petitioners did not move to join their longshoremen as parties. Nevertheless, at least Commissioner Van Namee and possibly Chairman Moran relied upon the availability of such relief in rejecting the petitioners' challenge to the economic infeasibility of the hardhat standard. At oral argument counsel for the Secretary indicated in response to a question from the court that the Secretary might not oppose granting such relief in appropriate circumstances. After the argument, however, we were advised by letter that this is not the Secretary's position.[15] To the contrary—in two cases now pending before the Commission,[16] the Secretary has taken the position that he has no authority to issue citations, and that the Commission has no authority to issue cease and desist orders, against employees. Our authority under § 11(a) of the Act appears to be derivative of that of the Secretary and the Commission.

With considerable misgivings, we conclude that Congress did not intend to confer on the Secretary or the Commission the power to sanction employees. Sections 2(b)(2) and 5(b) cannot be read apart from the detailed scheme of enforcement set out in §§ 9, 10 and 17 of the Act. It seems clear that this enforcement scheme is directed only against employers. Sections 9(a) and 10(a) provide for the issuance of citations and notifications of proposed penalties only to employers. 29 U.S.C. §§ 658(a), 659(a). Section 10(a) refers only

to an employer's opportunity to contest a citation and notification of proposed penalty. Only after an employer has filed a notice of contest does the Commission obtain general jurisdiction. Employees and their representatives may then elect to intervene under § 10(c). The only independent right granted employees by § 10(c) is to contest before the Commission the reasonableness of any time period fixed by the Secretary in a citation for the abatement of a violation. Section 17, 29 U.S.C. § 666, provides for the assessment of civil monetary penalties only against employers.[17] That the Act's use of the term "employer" is truly generic is made plain in § 3, the definitional section, where "employer" and "employee" are separately defined. *See* 29 U.S.C. § 652. We find no room for loose construction of the term of art.

We are likewise unable to find support in § 5(b) for the proposition that the Act's sanctions can be directed at employees. Although this provision's injunction to employees is essentially devoid of content if not enforceable, we reluctantly conclude that this result precisely coincides with the congressional intent. The House bill, H.R. 16785, did not even impose this nominal obligation on employees. The Senate version, § 5(b) of S. 2193, which was accepted in the Conference Committee, contained what is now § 5(b) of the Act. There was virtually no floor debate on the provision in the Senate, and none in the House following the action by the Conference Committee. In such circumstances it cannot be seriously contended that Congress intended to make the amenability of employees to coercive process co-extensive with employers. The Senate Report on the employee duty section, quoted in full, says:

---

15. In that letter the Secretary urged this court to disregard the issue until a case arises in which such a sanction is attempted. For the reasons explained in note 14 *supra,* we feel constrained to squarely address the issue in this case.

16. *See* Brief for the Secretary, *Dunlop v. Nacirema Operating Co.,* OSAHRC Docket Nos. 12099 & 13332, at 9–33.

17. Compare in this regard the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801–960. Section 109(a)(1)–(2) provides for civil penalties against miners as well as employers. 30 U.S.C. § 819(a)(1)–(2). In contrast to OSHA, § 109(a)(4) preserves the right to jury trial in the civil penalty enforcement proceeding. 30 U.S.C. § 819(a)(4). *See Frank Irey, Jr., Inc. v. OSHRC,* 519 F.2d 1200 (3d Cir. 1975) (en banc), *petition for cert. filed,* 44 U.S. L.W. 3363 (U.S. Nov. 21, 1975) (No. 75–748).

The committee recognizes that accomplishment of the purposes of this bill cannot be totally achieved without the fullest cooperation of affected employees. In this connection, Section 5(b) expressly places upon each employee the obligation to comply with standards and other applicable requirements under the act.

It should be noted, too, that studies of employee motivation are among the research efforts which the committee expects to be undertaken under section 18, and it is hoped that such studies, as well as the programs for employee and employer training authorized by section 18(f), will provide the basis for achieving the fullest possible commitment of individual workers to the health and safety efforts of their employers. It has been made clear to the committee that the most successful plant safety programs are those which emphasize employee participation in their formulation and administration; every effort should therefore be made to maximize such participation throughout industry.

The committee does not intend the employee-duty provided in section 5(b) to diminish in anyway the employer's compliance responsibilities or his responsibility to assure compliance by his own employees. Final responsibility for compliance with the requirements of this act remains with the employer.

S.Rep. No. 91–1282, *supra*, at 10–11, U.S. Code Cong. & Admin.News 1970, p. 5187. We simply cannot accept the argument that a remedy for violations of § 5(b) can be implied from its terms. All the evidence points in the other direction.[18]

 Nor do we believe that the language in § 10(c) authorizing the Commission to issue orders "directing other appropriate relief" can be stretched to the point that it includes relief against employees. Rather, the generality of that language must be deemed limited by its context—relief in connection with the Secretary's citation. The Secretary appears not to have authority to issue a citation against an employee, and the Commission's powers cannot be any broader. "Other appropriate relief" refers to other appropriate relief against an employer.

 This court's power under § 11(a) of the Act is framed in somewhat broader terms:

Upon [the filing of a petition for review], the court shall have jurisdiction of the

---

18. Our conclusion is fortified by reference to the following post-enactment colloquy between Representative Steiger, a co-sponsor of OSHA, and Representative Hungate:

MR. HUNGATE: Now, employer-employee. We have had a line of testimony about, tell this guy to wear a hardhat, or there are six guys on the job and five of them do and the other guy tosses it out, it is a hot day. And they come through and the employer gets fined and the employee does not. What can we do about that?
MR. STEIGER: Well, Mr. Chairman when this bill was being considered, that was a question on which we spent a considerable amount of time. I would have to say the business community, at the time the bill was under consideration, took a very hard line that they did not want the Federal government to be in the business of disciplining their employees . . . But on balance, Mr. Chairman, I would not want to see us amend the law to impose Federal government discipline on employees. I think that is something left between management and labor.
MR. HUNGATE: No, there is not. The law says the employer is responsible . . . but again I want to simply reiterate that I think it would be a mistake to interfere in labor-management relations in terms of who has discipline responsibility . . . I think that is something where there are unions and managements negotiating that can be dealt with in the negotiation process.
MR. HUNGATE: Is fining the employer an act of discipline?
MR. STEIGER: Yes, I think it would be.
MR. HUNGATE: Then we are interfering in the field of discipline in labor-management relations.
MR. STEIGER: No, we are not.
MR. STEIGER: The employer is fined because, under the law, that is his responsibility. I would hope that the employer would be in the position to deal with his employee who put himself in the position of having his employer fined.
Hearings before the Subcomm. on Environmental Problems Affecting Small Business of the Select Comm. on Small Business, 92d Cong., 2d Sess. 490–91 (1972).

proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified."

29 U.S.C. § 660(a).

Clearly we can, in deciding whether and to what extent we will enforce a Commission order affirming a Secretary's citation, take into account the fact that employee intransigence in spite of employer best efforts would make enforcement inequitable. In such a case we could deny or limit enforcement. But § 11(a) does not grant to this court any independent authority to sanction employees.

## B

We hold, then, that Commissioner Van Namee's reason for rejecting the petitioners' economic infeasibility defense cannot withstand analysis. We must face squarely the issue whether the Secretary can announce, and insist on employer compliance with, a standard which employees are likely to resist to the point of concerted work stoppages. To frame the issue in slightly different terms, can the Secretary insist that an employer in the collective bargaining process bargain to retain the right to discipline employees for violation of safety standards which are patently reasonable, and are economically feasible except for employee resistance?

■ We hold that the Secretary has such power. As Part IIIA of this opinion has indicated, the entire thrust of the Act is to place primary responsibility for safety in the work place upon the employer. That, certainly, is a decision within the legislative competence of Congress. In some cases, undoubtedly, such a policy will result in work stoppages. But as we observed in *AFL-CIO v. Brennan, supra,* the task of weighing the economic feasibility of a regu-

lation is conferred upon the Secretary. He has concluded that stevedores must take all available legal steps to secure compliance by the longshoremen with the hardhat standard.

■ We can perceive several legal remedies which employers in petitioners' shoes might find availing. An employer can bargain in good faith with the representatives of its employees for the right to discharge or discipline any employee who disobeys an OSHA standard. Because occupational safety and health would seem to be subsumed within the subjects of mandatory collective bargaining—wages, hours and conditions of employment, *see* 29 U.S.C. § 158(d)—the employer can, consistent with its duty to bargain in good faith, insist to the point of impasse upon the right to discharge or discipline disobedient employees. *See NLRB v. American National Insurance Co.,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Where the employer's prerogative in such matters is established, that right can be enforced under § 301. Should discipline or discharge nevertheless provoke a work stoppage, *Boys Markets* injunctive relief would be available if the parties have agreed upon a no-strike or grievance and arbitration provision. And even in those cases in which an injunction cannot be obtained, or where arbitration fails to vindicate the employer's action, the employer can still apply to the Secretary pursuant to § 6(d) of the Act, 29 U.S.C. § 655(d), for a variance from a promulgated standard, on a showing that alternative methods for protecting employees would be equally effective. *See Brennan v. OSHRC (Underhill Construction Corp.),* 513 F.2d 1032, 1036 (2d Cir. 1975). Moreover, under § 10(c), 29 U.S.C. § 659(c), the Secretary has authority to extend the time within which a violation of a standard must be abated.

■ In this case petitioners have produced no evidence demonstrating that they have bargained for a unilateral privilege of discharge or discipline, that they have actually discharged or disciplined, or threatened to discharge or discipline, any employee

who defied the hardhat standard, or that they have petitioned the Secretary for a variance or an extension of the time within which compliance is to be achieved. We conclude that as a matter of law petitioners have failed to establish the infeasibility of the challenged regulation.

The order of the Commission enforcing the Secretary's citations will be affirmed. The petition for review will be denied.