**I.T.O. CORPORATION OF NEW ENGLAND et al., Petitioners,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**

and

**W. J. Usery, Jr., Secretary of Labor, Respondents.**

**No. 76–1070.**

United States Court of Appeals, First Circuit.

Argued June 3, 1976.

Decided Aug. 24, 1976.

**544**

Leo F. Glynn, Boston, Mass., with whom Glynn & Dempsey, Boston, Mass., was on brief, for petitioners.

Dennis K. Kade, Atty., U. S. Dept. of Labor, Washington, D. C., with whom William Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol. Occupational Safety and Health, and Michael H. Levin, for appellate litigation, Washington, D. C., were on brief, for the Secretary of Labor.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is a petition, brought under § 11(a) of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 660(a), to review an order of the Occupational Safety and Health Review Commission (OSHRC), assessing a civil penalty against several stevedores (for purposes of this case, I.T.O. Corporation of New England, hereinafter I.T.O.)[1] for failure to obtain compliance by their longshoremen employees with a regulation requiring the wearing of hard hats. 29 C.F.R. § 1918.105(a) (1975). I.T.O. contends that it took all economically feasible steps to comply and that OSHRC erred in concluding it violated the regulation. We affirm.

The facts are largely undisputed. I.T.O. is a contract stevedoring corporation which is engaged in loading and unloading ship cargo in the Port of Boston. It obtains its daily work force of approximately sixty longshoremen from the hiring hall of the International Longshoremen's Association (ILA), a union with whom I.T.O. has—by virtue of its membership in the Boston Shipping Association—a comprehensive collective bargaining agreement. This agreement contained a no strike clause, a clause providing for grievance resolutions and binding arbitration, and a provision making it mandatory for employees to use the safety devices and protective equipment required by applicable law.

When the Act became effective in April, 1971, the federal policy was to stress voluntary compliance with the requirement that longshoremen wear hard hats—rather than to enforce it by means of formal citations and fines. In May, 1973, the Department

---

1. Nine similar citations against stevedores, each being a member of the Boston Shipping Association, were consolidated, it being stipulated that the record in the I.T.O. case was representative of all.

of Labor announced that, beginning on July 2, 1973, it would rigorously enforce the hard hat requirement by citations and fines. I.T.O., thereafter, took a number of steps to induce its employees to comply. It supplied its entire work force with new hats, erected six to eight signs urging compliance, inserted flyers in pay envelopes, instructed the supervisors to urge the longshoremen to wear the hats, held various meetings, and included in the telephone tape recording played to longshoremen calling about jobs an announcement that hard hats were to be worn. I.T.O., however, did not take the additional steps of attempting to induce compliance by threatening or actually disciplining employees who worked without wearing hard hats.

Two weeks after the new enforcement policy went into effect, an Occupational Safety and Health Administration inspector visited the VICTORIA, a ship discharging lumber under I.T.O.'s supervision. He observed that some thirteen men in four of the holds were not wearing hard hats. I.T.O. was cited for a non-serious violation of the Act on July 25, 1973.[2] A one day hearing was held on December 19, 1973 before an administrative law judge. I.T.O. defended against the citation, there and here, on the ground that it had taken all economically feasible steps to achieve compliance with the Act on the part of its employees. It maintained that one measure it did not take—disciplining employees who violate the regulation—would have led to wildcat strikes and, thus, was not economically feasible. The administrative law judge agreed with I.T.O.'s contention, and, on September 29, 1974, issued a decision exculpating I.T.O. Over a year later,

OSHRC, which relied upon two earlier decisions,[3] reversed the administrative law judge and issued the citations. Three years after the inspection, we deal with the issues raised by the petition. OSHRC would put it that safety has been forestalled for three long years; petitioners would say that bureaucratic tyranny has been prevented once again by the tribunes of the people on the Boston docks. In any event, the processes of decision have advanced at a stately, if not leisurely, pace.

Federal law requires that longshoremen "be protected by protective hats". 29 C.F.R. § 1918.105(a). There is no disputing that this measure qualifies as a patently reasonable safety requirement. Consistent with the Act's objective of placing the primary responsibility for safety in the work place upon the employer, see, e. g., 29 U.S.C. §§ 654(a)(1), 654(a)(2), federal regulations provide that an employer is responsible for his employees' failures to comply with the hard hat requirement. 20 C.F.R. § 1918.2(a). The employer's liability, however, is not absolute. See National Realty & Construction Co. v. OSHRC, 160 U.S.App. D.C. 133, 489 F.2d 1257 (1973); cf. Cape & Vineyard Division of New Bedford v. OSHRC, 512 F.2d 1148 (1st Cir. 1975). An employer may be held answerable for a violation resulting from his employee's misconduct only when "demonstrably feasible measures" existed for reducing the incidents of such violations but were not taken. See Brennan v. OSHRC, 502 F.2d 946, 951–52 (3d Cir. 1974). The sole substantial issue in this appeal is whether I.T.O., as a matter of law, took all demonstrably feasible measures to induce its employees to comply with the hard hat requirement.[4] The narrow

---

**2.** A "serious" violation is one involving a substantial risk of death or serious physical harm. 29 U.S.C. § 666(b) and (j). A non-serious violation carries a discretionary penalty of up to $1000. In this case the penalty ultimately assessed was $45.

**3.** *Secretary v. Independent Pier Co.,* OSAHRC —(Docket No. 4897, Oct. 29, 1975); *Secretary v. Atlantic & Gulf Stevedores, Inc.,* 16 OS-AHRC 770 (1975). Particularly in view of facts

stipulated in this case, the OSHRC had no difficulty in deeming these cases controlling.

**4.** I.T.O.'s other arguments are that the imposition of *criminal* sanctions presupposes volition, that it is unfair and contrary to Congressional intent to put the major burden of enforcement on employers, and that certain studies of employee motivation, required by the Act have not been carried out. These arguments (a) were not made a basis below for the requested

question before us is whether OSHRC acted consistently with the Act in rejecting I.T. O.'s claim that disciplinary action was economically unfeasible.

In considering petitioner's claim that further enforcement efforts on its part were economically unfeasible as a matter of law, we have the benefit of a thoughtful opinion from the Third Circuit, squarely rejecting I.T.O.'s position. *Atlantic & Gulf Stevedoring, Inc. v. OSHRC,* 534 F.2d 541 (3d Cir. 1976). There, the employer's claim that disciplinary action would have been economically unfeasible was far more substantial than petitioner's. Unlike the case at bar, *see infra,* there clearly was substantial evidence that a walkout was likely if the hard hat requirement were enforced by disciplinary action, and it did not appear so likely that the employer had, under its collective bargaining agreement, the right to discipline employees for violating safety requirements imposed by federal law. On that record, the court held the employer had no defense. Since the Act places primary responsibility for achieving increased safety upon employers and since the acceptance of petitioner's position would have made it easy for employers to evade their responsibilities to urge maximum employee compliance, the court concluded that the Secretary can insist upon employer compliance with a standard which employees are likely to resist to the point of concerted work stoppages. Before an employer has a defense of economic unfeasibility, the Third Circuit reasoned that he must take all available legal steps to secure compliance, including (1) bargaining, perhaps to the point of impasse, for the right to discipline disobedient employees; (2) exercising whatever right he has to discipline noncomplying employees and, in the event work stoppages occur, pursuing his remedies under § 301 and *Boys Markets, Inc. v. Retail Clerks,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), or under the grievance and arbitration procedure; and (3) if an injunction cannot be obtained or if arbitration fails to

relief, (b) misconstrue the power of Congress civilly to enforce safety standards, or (c) mis-

vindicate the employer, attempting to formulate equally effective alternative methods of protecting the employees and applying to the Secretary, pursuant to § 6(d) of the Act, 29 U.S.C. § 655(d) for a variance, or applying for an extension pursuant to § 10(c). *Id.* at 555–556.

■ Although we see no reason to disagree with the Third Circuit's view, we need not endorse everything in the court's opinion to reject petitioner's claim. We need only note that we agree that OSHRC is acting permissibly in imposing a heavy burden on employers claiming that the possibility of concerted employee resistance renders economically unfeasible any effort on their part to use disciplinary measures to achieve compliance with the Act. Given the Act's objective of achieving maximum compliance with safety regulations, we think it entirely appropriate for OSHRC to require employers to make extensive good faith efforts to induce compliance, including actions which employees may resist through work stoppages.

Here, the situation faced by I.T.O. and the efforts it made make it clear that unfeasibility under any realistic standard was not demonstrated. The evidence that concerted work stoppages would result if I.T.O. took disciplinary action against employees who violated the hard hat requirement is almost entirely speculation. Petitioner's fears apparently are based upon a number of employee complaints that the hats created minor inconveniences—e. g., because they were too heavy, too light, too hot, or too cold—and upon an incident, at some unidentified past time, in which a crew walked out after one of its members was arrested for pilfering. The objective evidence is that the likelihood of such a wildcat strike is remote. There appears to be little basis for concluding that there is deep rooted employee opposition to the hard hat requirement: the average rate of compliance in the port was 85 per cent and compli-

conceive the language and the history of the statute. They merit no further analysis.

ance in the neighboring Port of Providence was described as "good".

Moreover, such compliance as was achieved in Boston was realized in the absence of any evidence of detailed planning and discussion with ILA officials. More significantly, the testimony was that no wildcat strike had ever occurred as a result of any disciplinary action taken against ILA members, and that no wildcat strike of any kind had occurred in at least 32 years. Two ILA officials, moreover, testified that if disciplinary action were taken to enforce mandatory hard hat use, the ILA would resort to the contractual grievance arbitration procedure rather than support a walkout or strike. Finally, even if a wildcat strike were to occur, the I.T.O. presumably could, given the no strike clause in the collective bargaining agreement and provision for binding arbitration, receive injunctive relief under *Boys Market, Inc. v. Retail Clerks, supra,* 398 U.S. at 235, 90 S.Ct. 1583; see *Gateway Coal Corp. v. UMW,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), and arguably damages against the ILA if they did not take all reasonable steps to end it. *See Eazor Express, Inc. v. Int'l Brotherhood of Teamsters,* 520 F.2d 951 (3d Cir. 1975). But see Recent Cases, 89 Harv.L.Rev. 601 (1976).

■ Here, where the employer apparently has the right under the collective bargaining agreement to discipline non-complying employees, where there has been no persuasive showing that wildcat strikes would result if disciplinary action were taken, and where the petitioner almost certainly has legal remedies that will adequately protect its interests if a walkout were to occur, it would reduce the Act to an exhortation to hold that petitioner has taken all demonstrably feasible steps to comply.

*Affirmed.*

CAMPBELL, Circuit Judge (concurring).

I think the court goes too far when it terms the rule "patently reasonable" and indicates that the entire Act will be reduced to an "exhortation" if the petitioner's actions to date are accepted as adequate. In *Atlantic & Gulf Stevedores, Inc. v. OSHRC, supra,* at 546 n. 7, the court referred to statistics showing that head injuries comprised only a small fraction (perhaps 1%) of total longshoring injuries, and to a deteriorating rate of compliance as "many workers tried the hats, found them uncomfortable or cumbersome, and discontinued their use." Certainly there are some longshoring evolutions where helmets are superfluous, and I can see the enforced wearing of a helmet on such occasions as a matter of justifiable irritation. Hence while I cannot say that a rule requiring helmets on all occasions is so arbitrary as to be beyond the Secretary's power, I doubt that its reasonableness is as "patent" as the court says.

More to the point, I see clear grounds for distinguishing between the enforcement efforts that it is reasonable to demand of an employer where only the non-complying employee is endangered, and those reasonable to demand with respect to safety rules whose breach by one employee creates a danger to others. In the latter instance, I agree that OSHRC would not be acting responsibly if it did not make employers take all feasible measures, up to and including discharge, to ensure employee compliance. Here, however, where we deal with a default endangering only a non-complying employee himself, it seems to me that a less forceful approach would not undermine the purpose of the Act, and would be more compatible with traditional employer-employee relationships. It seems extreme in this context to force employers to stir up discontent and unrest with their own employees by having to enforce, across the board, such an unpopular rule. (Not too long ago this court paid much attention, even invoking the Constitution, to the hair preferences of students, a matter I think is of less importance than the self-respect and working relationships of grown men.) It is, in any event, much more burdensome for an employer to enforce this rule than to enforce a safety practice whose omission threatens other employees, where it would be obvious to the employees that their employer was acting in the best interest of all.

I have to concede, however, for reasons amply stated by Judge Gibbons in *Atlantic & Gulf Stevedores* and by my brothers, that the legal authority of the Commission to take the approach chosen is not much in doubt, however doubtful I may think its judgment. Accordingly I reluctantly concur.