594 F.2d 566
 7 O.S.H. Cas.(BNA) 1119, 1979 O.S.H.D. (CCH) P 23,386
RMI COMPANY, Petitioner,
v.
SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR and
Occupational Safetyand Health Review Commission of The
United States of America, and Oil, Chemicaland Atomic
Workers International Union, Respondents.
 No. 78-3312.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 7, 1978.
Decided March 13, 1979.
 
 Robert H. Gillespy, Richard W. McLaren, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for petitioner.
 OSHRC, Washington, D. C., William G. Staton, U. S. Dept. of Labor, Washington, D. C., Steve Wodka, Washington, D. C., for respondents.
 Before CELEBREZZE, KEITH and MERRITT, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 RMI Company (RMI) petitions for review of a decision of the Occupational Safety and Health Review Commission (OSHRC)[1] which affirmed a decision of an Administrative Law Judge (ALJ).[2] The ALJ found RMI to be in violation of noise standards promulgated by the Secretary of Labor[3] and ordered installation of engineering controls. RMI contends that the OSHRC erred in finding the engineering controls to be technologically "feasible," as that term is used in the noise standard, and in ordering installation of economically infeasible engineering controls. We affirm the decision insofar as it found the controls to be technologically feasible. We adopt a cost-benefit analytical framework for determining the economic feasibility of such controls and remand the cause to the OSHRC for application of this standard.
 
 FACTS
 
 2
 RMI is engaged in the production of titanium at its Ashtabula, Ohio, facility. As a part of this process it is necessary to remove or chip "spalt" (a combination of titanium sponge and sodium chloride) from 10,000 pound pots. The pots are put in place on a chipping deck by a forklift truck and the chipping operation is performed by three stationary chipping guns. These guns, resembling large horizontal jackhammers, are fifteen feet long and located six to seven feet apart. Each gun consists of a control console area, a gun support, a hydraboom, and a chipping hammer and bit that move along a rail to contact the spalt. During a typical work shift, the operator of each gun spends roughly three hours at the control console operating the gun, two hours at the pot site breaking up large lumps of spalt, cleaning up, performing miscellaneous maintenance, and replacing bits, and one-half hour maneuvering the pots.
 
 
 3
 The impact of the gun bits on the spalt emits a continuous staccato noise. The noise level is very high and was measured at approximately 107 decibels (dBA) over the seven hours of exposure during the normal work shift. This combination of noise level and duration of exposure per day exceeds that permitted by Table G-16 of 29 C.F.R. § 1910.95(b).[4]
 
 
 4
 RMI has long realized the danger to its employees from such high noise levels. It has implemented a safety program requiring the chipping gun operators to wear "personal protective equipment," Viz., earmuffs. The ALJ found, and it is not disputed by the Secretary, that the earmuffs reduced the sound to which the employees were exposed to levels permitted by Table G-16. The Secretary has not disputed that RMI's program was effectively enforced.
 
 
 5
 Despite the effectiveness of RMI's safety program, the Secretary cited RMI for a nonserious violation[5] of 29 U.S.C. § 654(a)(2), which requires employers to "comply with occupational safety and health standards promulgated under" the Occupational Safety and Health Act.[6] The Secretary asserted that RMI should install engineering controls to reduce noise levels in the chipping area. The Secretary's expert recommended that acoustical enclosures be placed around both the pot area and the console area. He estimated that the cost of installation of such enclosures, plus other necessary modifications, would be approximately $125,000.
 
 
 6
 RMI contested the Secretary's citation. The ALJ, after a hearing, determined that enclosures around the pot area were not feasible and he modified the citation to that effect.[7] He found that enclosures around the console area of each gun were technologically feasible, however, and affirmed the citation in that regard. He found that such engineering controls would reduce sound levels to those permitted by Table G-16 while employees are working in the console area. It would still be necessary, however, for employees to wear personal protective equipment while away from the console area performing their other tasks since the noise reduction from the console enclosures would not be sufficient to bring the overall exposure during the work shift to a level permitted by Table G-16.[8] No finding was made as to the cost of installing these enclosures, although RMI has asserted to this court that the cost would exceed $100,000.
 
 
 7
 On discretionary review by the OSHRC,[9] the ALJ's decision was affirmed in full. It agreed that the engineering controls need not reduce sound levels to those permitted by Table G-16 for the entire work shift in order to be "feasible." It was held sufficient that the controls reduced noise to permissible levels for the three hours per day the employees spent in the console area. This reduction was seen as substantially decreasing exposure to very high noise levels, thus providing the employees with a significant protection against noise-related injury. The OSHRC did not consider the ALJ's determination that enclosure of the pot area was not feasible since that issue was not urged before it by the Secretary. It also found it unnecessary to consider the issue of the economic feasibility of the controls since RMI had not urged that issue before it.
 
 TECHNOLOGICAL FEASIBILITY
 
 8
 Under 29 U.S.C. § 660(a), "any person adversely affected or aggrieved by an order of the" OSHRC "may obtain review of such order in" the appropriate United States Court of Appeals. Our scope of review in such cases, not unlike that in our review of other administrative agency action, is a narrow one.[10] The statute provides that the OSHRC's factual findings, "if supported by substantial evidence on the record considered as a whole, shall be conclusive."[11] Inasmuch as RMI does not contest any of the OSHRC's factual findings, but rather the legal consequences flowing therefrom, we accept the facts found below as supported by substantial evidence.
 
 
 9
 In reviewing OSHRC determinations other than factual findings, this circuit has held that our scope of review is that applicable to administrative agencies generally as found in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Empire-Detroit Steel Div. v. OSHRC, 579 F.2d 378, 383 (6th Cir. 1978); Dunlop v. Rockwell International, 540 F.2d 1283, 1288 (6th Cir. 1976), citing cases. In Dunlop we quoted the standard set out in § 706(2)(A):
 
 
 10
 " 'The reviewing court shall
 
 
 11
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 12
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "
 
 We continued:
 
 13
 The Supreme Court in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc. et al., 419 U.S. 281, 285-286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), stated:
 
 
 14
 " 'Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." . . . While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. (Citation deleted.)' "
 
 540 F.2d at 1288.[12]
 
 15
 Applying the above standard to all aspects of the OSHRC decision other than economic feasibility, we hold that the decision passes muster. We cannot say that the decision on technological feasibility is "arbitrary and capricious" inasmuch as it clearly implements a substantial reduction in noise levels for at least the three hour period every day that the employees spend at the control consoles of the chipping guns. It was not unreasonable to hold that the enclosures represented "feasible engineering controls," as that phrase is used in the regulation, even though overall noise levels were not brought within Table G-16 limits.[13]
 
 
 16
 Given the fact that the employees will still be required to wear personal protective equipment for the remaining time they spend in the vicinity of the chipping guns,[14] we probably would not have reached the same result as did the OSHRC were we considering this case as an initial proposition. We are not called upon, though, to decide whether the OSHRC chose the best course or the Most reasonable interpretation of the regulation. We are only asked to decide if it chose a reasonable interpretation, which was done here. Floyd S. Pike Electrical Contractor, Inc. v. OSHRC, 576 F.2d 72, 75 (5th Cir. 1978). We are not "empowered to substitute (our) judgment for that of the agency." We cannot say "there has been a clear error of judgment."[15] "As a general matter, the (OSHRC) is entitled to great deference in its reasonable interpretations of regulations promulgated under the Act." (citations omitted). Diebold, Inc. v. Marshall, 585 F.2d 1327, 1332, 1334 & n. 10 (6th Cir. 1978). Therefore, in all respects save economic feasibility we affirm the decision of the OSHRC.[16]
 
 ECONOMIC FEASIBILITY
 
 17
 Neither the statute nor the particular regulation involved here specifically discuss economic considerations relative to their implementation. Both, however, speak in terms of "feasibility." 29 U.S.C. § 655(b)(5); 29 C.F.R. § 1910.95(b)(1). A consensus is developing among the circuits that the term should encompass both technological and economic feasibility. Numerous cases have held that the Secretary should weigh the estimated costs of compliance against the benefits reasonably expected therefrom when promulgating or enforcing a regulation. American Petroleum Inst. v. OSHA, 581 F.2d 493, 502-03 (5th Cir. 1978), Cert. granted --- U.S. ----, 99 S.Ct. 1212, 59 L.Ed.2d 453 (1979);[17] American Iron & Steel Inst. v. OSHA, 577 F.2d 825, 835-37 (3d Cir. 1978), Cert. den., 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); U.P.S. of Ohio, Inc. v. OSHRC, 570 F.2d 806, 811-12 (8th Cir. 1978); AFL-CIO v. Brennan, 530 F.2d 109, 122-23 (3d Cir. 1975); Arkansas-Best Freight Systems, Inc. v. OSHRC, 529 F.2d 649, 653-54 (8th Cir. 1976); Industrial Union Dept., AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 341, 499 F.2d 467, 477 (1974). See also I.T.O. Corp. v. OSHRC, 540 F.2d 543, 546 (1st Cir. 1976); Atlantic & Gulf Stevedores, Inc. v. OSHRC, 534 F.2d 541, 548, 555 (3d Cir. 1976). These cases have reached such results based upon Congressional intent derived both from the statutory scheme and language and legislative history of the Act.
 
 
 18
 More particularly, the seventh circuit has held that the word " feasible" in § 1910.95(b)(1) should be construed to include both technological and economic feasibility. Turner Co. v. Secretary of Labor, 561 F.2d 82 (7th Cir. 1977).[18] The court said such a construction was "in accord with the clear intent of Congress and the purpose of the Occupational Safety and Health Act." Id. at 83.
 
 
 19
 The economic feasibility test adopted by the seventh circuit in Turner Co. was that espoused by the OSHRC itself in another case. In Continental Can Co., 1976-77 CCH OSHD P 21,009, 4 BNA OSHC 1541 (1976), the OSHRC determined that the word "feasible" in § 1910.95(b)(1) included a component of economic feasibility. This was not limited, as urged there by the Secretary, to determining whether the employer could afford the controls. Rather, the costs of the proposed controls were to be balanced against the proposed benefits flowing therefrom in order that resources would be allocated in priority to the degree of harm established. Based on its analysis of Congressional intent, the OSHRC adopted the following standard:
 
 
 20
 " ' * * * we conclude that the standard should be interpreted to require those engineering and administrative controls which are economically as well as technically feasible. Controls may be economically feasible even though they are expensive and increase production costs. See Arkansas-Best Freight Systems, Inc., 529 F.2d 649, 653 (3 OSHC 1910) (8th Cir. Jan. 29, 1976); Industrial Union Department, AFL-CIO v. Hodgson, supra, (162 U.S.App.D.C. 331,) 499 F.2d (467) at 477. But they will not be required without regard to the costs which must be incurred and the benefits they will achieve. In determining whether controls are economically feasible, all the relevant cost and benefit factors must be weighed.' "
 
 
 21
 561 F.2d at 85, quoting Continental Can Co.[19]
 
 
 22
 We agree that economic feasibility should be considered by the Secretary both in promulgating and enforcing regulations.[20] We approve the above-stated cost-benefit analysis employed by the OSHRC.
 
 
 23
 It must be emphasized that the primary purpose of the statute and regulations is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). Thus, the benefits to employees should weigh heavier on the scale than the costs to employers. Controls will not necessarily be economically infeasible merely because they are expensive.
 
 
 24
 But neither will controls necessarily be economically feasible merely because the employer can easily (or otherwise) afford them. In order to justify the expenditure, there must be a reasonable assurance that there will be an appreciable and corresponding improvement in working conditions. The determination of how the cost-benefit balance tips in any given case must necessarily be made on an Ad hoc basis. We do not today prescribe any rigid formula for conducting such analysis. We only insist that the Secretary, and the OSHRC on review, weigh the costs of compliance against the benefits expected to be achieved thereby in order to determine whether the proposed remedy is economically feasible.
 
 
 25
 Therefore, the OSHRC erred in not making a determination of the economic feasibility of the Secretary's proposed engineering controls. Coming as it did after the OSHRC decision in Continental Can Co., this failure to consider economic feasibility was especially "arbitrary, capricious, an abuse of discretion (and) otherwise not in accordance with law." 5 U.S.C. § 706(2) (A). In this regard, the decision of the OSHRC is set aside and the cause is remanded for further proceedings.
 
 
 26
 CAN RMI RAISE ECONOMIC FEASIBILITY?
 
 
 27
 As noted earlier, RMI did not specifically urge the issue of economic feasibility before the ALJ or the OSHRC. The Secretary argues that this failure bars this court from considering the issue because of the portion of 29 U.S.C. § 660(a) which provides: "No objection that has not been urged before the (OSHRC) shall be considered by the court (of appeals), unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The Secretary's reliance upon this provision is misplaced.[21]
 
 
 28
 The OSHRC decision in Continental Can Co., 1976-77 CCH OSHD P 21,009, 4 BNA OSHC 1541 (1976), not only held that the economic feasibility of the engineering controls should be evaluated. It also held that the burden of proof on economic feasibility rested on the Secretary.[22] We approve this holding since it is in accord with the general rule: "In all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary."[23] See Diebold, Inc. v. Marshall, 585 F.2d 1327, 1333 (6th Cir. 1978), collecting cases (Secretary has burden of proving technological feasibility); But see I.T.O. Corp. v. OSHRC, 540 F.2d 543, 546 (1st Cir. 1976) (burden on employer to show economic infeasibility due to concerted employee resistance) and Arkansas-Best Freight Systems, Inc. v. OSHRC, 529 F.2d 649, 654 (8th Cir. 1976) (employer failed to produce evidence that it could not absorb cost of compliance). Cf. Southern Colorado Prestress Co. v. OSHRC, 586 F.2d 1342, 1351 (10th Cir. 1978) (employer has burden of proof to establish technological or economic impossibility).
 
 
 29
 The Secretary must prove both the technological and economic feasibility of the proposed controls as an element of showing that a violation has occurred. This is particularly appropriate in the instant case since both technological and economic feasibility have been interpreted to be two components of the same word ("feasible") in § 1910.95(b)(1). Therefore, the burden of raising the issue of economic feasibility was not on RMI but was on the Secretary and RMI cannot be barred from arguing the issue before this court.
 
 
 30
 The unusual procedural posture of this case arose because of the fact that Continental Can Co. was not decided by the OSHRC until after the ALJ's decision here and the filing of RMI's brief to the OSHRC. Thus, neither the Secretary nor RMI were on notice to litigate the issue of economic feasibility since it was not until the Continental Can Co. decision that anyone knew the OSHRC considered this to be an element of the Secretary's case. It would be fundamentally unfair to bar RMI from arguing economic feasibility to this court when the company had no reason to know it was a discrete element involved in the proceedings below and when, once it became such after Continental Can Co., the burden of proof on the issue was not on RMI but was on the Secretary. See Brennan v. OSHRC, 511 F.2d 1139, 1142-43 & n. 4 (9th Cir. 1975).
 
 
 31
 It would be equally unfair, however, to simply set aside the OSHRC decision by holding that the Secretary failed to meet his burden of proof since he, too, was unaware of the OSHRC's position until Continental Can Co., decided after the ALJ hearing and submission to the OSHRC here.[24] While RMI has requested that we simply decide the issue of economic feasibility on our own, we cannot do so for at least two reasons. First, there is not a sufficient indication in the record as to what the cost of the controls would total.[25] We could not very well conduct a cost-benefit analysis without a reasonable estimate of the cost factor. Second, we are without power to make such determinations as an initial matter. The statute clearly states that the function of the court of appeals is to Review the decisions of the OSHRC, 29 U.S.C. § 660(a), and we would overstep the bounds of our authority were we to make a cost-benefit analysis without the aid of an OSHRC finding on the question. Therefore, the appropriate disposition is to remand the cause to the OSHRC for the taking of additional evidence on the issue of economic feasibility and for a determination of whether the costs of installing the engineering controls are outweighed by the benefits to the employees' health and safety reasonably expected to be achieved thereby.[26]
 
 
 32
 The decision of the OSHRC is affirmed in part and set aside in part and the cause is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 CCH OSHD P , 6 BNA OSHC 1523 (1978), OSHRC Docket No. 13773
 
 
 [2]
 1976-77 CCH OSHD P 20,893, BNA OSHC (1976)
 
 
 [3]
 29 C.F.R. § 1910.95(b), quoted Infra, note 4
 
 
 [4]
 29 C.F.R. § 1910.95(b):
 Table G-16--Permissible Noise Exposure 1
 Sound Level
 dBA slow
 Duration per day, hours response
8 ....................................................... 90
6 ....................................................... 92
4 ....................................................... 95
3 ....................................................... 97
2 ....................................................... 100
1 1/2 ................................................... 102
1 ....................................................... 105
1/2 ..................................................... 110
1/4 or less ............................................. 115
1 When the daily noise exposure is composed of two or more periods of noise exposuree of 
different levels, their combined effect should be considered, rather than the individual
effect of each. If the sum of the following fractionns: 
C sub1 /T sub1 k C sub2 /T sub2 Cn/Tn exceeds unity, then, the mixed exposure should be 
considered to exceed the limit value. Cn indicates the total time of exposure at a 
specified noise level, and Tn indicates the total time of exposure permitted at that 
level.
Exposure to impulsive or impact noise should not exceed 140 dB peak sound pressure level.
 (1) When employees are subjected to sound exceeding those listed in Table G-16, feasible administrative or engineering controls shall be utilized. If such controls fail to reduce sound levels within the levels of Table G-16, personal protective equipment shall be provided and used to reduce sound levels within the levels of the table.
 (2) If the variations in noise level involve maxima at intervals of 1 second or less, it is to be considered continuous.
 (3) In all cases where the sound levels exceed the values shown herein, a continuing, effective hearing conservation program shall be administered.
 
 
 [5]
 A nonserious violation is one cited pursuant to 29 U.S.C. § 666(c) for any violation other than a serious violation, defined in § 666(j)
 to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 
 
 [6]
 29 U.S.C. § 654(a):
 Each employer
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
 (2) shall comply with occupational safety and health standards promulgated under this chapter.
 § 654(a)(1) has been dubbed the "general duty clause" and § 654(a)(2) the "specific duty clause" since the former imposes a general duty to provide a workplace free of recognized hazards while the latter imposes a specific duty to comply with applicable regulations. See, e. g., General Electric Co. v. OSHRC, 583 F.2d 61, 63 & n.6 (2d Cir. 1978); Brennan v. OSHRC, 502 F.2d 946, 947 (3d Cir. 1974).
 See Generally M. Rothstein, Occupational Safety and Health Law §§ 61 Et seq. & 121 Et seq. (West 1978) (hereinafter "Rothstein").
 
 
 [7]
 The ALJ also deleted the proposed $50 penalty
 
 
 [8]
 Table G-16 provides that the combined effect should be considered when daily noise exposure consists of two or more periods at different levels. See note 4, Supra
 
 
 [9]
 Discretionary review was directed by one member of the OSHRC, pursuant to 29 U.S.C. § 661(i)
 
 
 [10]
 Compare our "enigmatic" scope of review under § 655(f) for cases involving the issuance of a standard by the Secretary. See American Petroleum Inst. v. OSHRC, 581 F.2d 493, 497 (5th Cir. 1978), Cert. granted --- U.S. ----, 99 S.Ct. 1212, 59 L.Ed.2d 453 (1979), and cases cited therein; Brennan v. OSHRC, 502 F.2d 946, 950 (3rd Cir. 1974). See generally Rothstein § 44
 
 
 [11]
 See Empire-Detroit Steel Div. v. OSHRC, 579 F.2d 378, 383 (6th Cir. 1978); Dunlop v. Rockwell International, 540 F.2d 1283, 1287 (6th Cir. 1976)
 
 
 [12]
 Most other circuits addressing the issue have adopted the same standard of review. Titanium Metals Corp. v. Usery, 579 F.2d 536, 540 & n. 2 (9th Cir. 1978); Marshall v. Cities Service Oil Co., 577 F.2d 126, 130-31 (10th Cir. 1978); Marshall v. Knutson Const. Co., 566 F.2d 596, 600-01 (8th Cir. 1977); Arkansas-Best Freight v. OSHRC, 529 F.2d 649, 653 (8th Cir. 1976); Brennan v. OSHRC, 502 F.2d 946, 951 (3d Cir. 1974); Brennan v. OSHRC, 487 F.2d 230 (5th Cir. 1973)
 The second circuit has articulated the scope of review to be whether the OSHRC's decision is unreasonable and inconsistent with the purpose of the regulation in question. General Electric Co. v. OSHRC, 583 F.2d 61, 64 (2d Cir. 1978), collecting cases.
 See generally Rothstein § 485.
 
 
 [13]
 RMI has argued that this determination was unreasonable as contrary to numerous ALJ decisions. The OSHRC is not bound by unreviewed ALJ decisions so we see no merit to this argument. The OSHRC decision was consistent with the prior OSHRC decisions in Continental Can Co., 1976-77 CCH OSHD P 21,009, 4 BNA OSHC 1541 (1976); Louisiana-Pacific Corp., 1977-78 CCH OSHD P 22,261, 5 BNA OSHC 1994 (1977); and Atlantic Steel Co., 1977-78 CCH OSHD P 22,483, 6 BNA OSHC 1289 (1978)
 
 
 [14]
 See note 8 Supra, and accompanying text
 
 
 [15]
 The Secretary's brief in this court emphasizes the serious but gradual damage caused by high noise levels. It also cites several extra-record studies showing a tendency of workers not to use personal protective equipment since hearing loss occurs gradually and is not noticeable from day to day or week to week and since personal protective equipment is often uncomfortable to wear. The Secretary thus considers engineering controls preferable to personal protective devices since the former are not as subject to the human element as are the latter. We question the reasonableness of this highly paternalistic attitude on the facts of this case. The employees may be even more likely not to wear their personal protective equipment when away from the control console since the enclosures would obviate wearing such when at the control console and they would be required to continually put on and take off the earmuffs. If the response to this argument is that the employees should have the earmuffs on continually, then the engineering controls become totally superfluous since the employees presently wear earmuffs continually, which achieves Table G-16 levels. The OSHRC apparently rejected this logic, however, and we cannot say it clearly erred in doing so
 
 
 [16]
 While some cases suggest that we should pay even greater deference to the OSHRC decision when it agrees with the position of the Secretary, the second circuit has refused to adopt this distinction and pays the same deference to the OSHRC decision regardless of whether it dovetails with the Secretary's position. See General Electric Co. v. OSHRC, 583 F.2d 61, 64 n. 7 (2d Cir. 1978), collecting cases. We would tend to agree with the second circuit that varying the deference paid to the OSHRC decision depending on how it relates to the Secretary's position is of questionable value analytically. See generally Rothstein §§ 488-89
 
 
 [17]
 The questions presented in the certiorari petition in American Petroleum include whether a health and safety standard promulgated pursuant to 29 U.S.C. § 655(b) must satisfy a cost-benefit test. See 47 U.S.L.W. 3541, 3542-43 (1979). The Supreme Court's eventual decision in the case can thus be expected to shed some light on the issue presented in the instant case
 
 
 [18]
 In Turner Co., a case very factually similar to the instant case, the OSHRC decision had ordered the company to install engineering controls designed to bring noise levels within those permitted by Table G-16. The estimated cost of such controls was approximately $30,000. The company had an effective program requiring the use of personal protective equipment and no employee was shown to have suffered any loss of hearing
 
 
 [19]
 The OSHRC has subsequently reaffirmed and employed this standard in several cases. Atlantic Steel Co., 1977-78 CCH OSHD P 22,843, 6 BNA OSHC 1289 (1978); Castle & Cooke Foods, 1977-78 CCH OSHD P 21,854, 5 BNA OSHC 1435 (1977), petition for review pending (9th Cir. No. 77-2565-66); Great Falls Tribune Co., 1977-78 CCH OSHD P 21,844, 5 BNA OSHC 1443 (1977)
 
 
 [20]
 See generally Rothstein §§ 81 & 99
 
 
 [21]
 The Secretary cites three cases in support of his argument. Keystone Roofing Co. v. OSHRC, 539 F.2d 960, 963-64 (3d Cir. 1976); Stockwell Mfg. Co. v. Usery, 536 F.2d 1306, 1309 (10th Cir. 1976); Felton Const. Co. v. OSHRC, 518 F.2d 49, 50-51 (9th Cir. 1975). A careful reading of these cases, however, reveals that in each of them no petition for review of the ALJ's decision was filed with the OSHRC nor did any Commissioner direct review of the ALJ decisions. Thus, the ALJ's decisions were adopted by the OSHRC simply by operation of law, 29 U.S.C. § 661(i); 29 C.F.R. § 2200.90, and the OSHRC never formally considered them. These cases are clearly distinguishable from the instant case wherein RMI petitioned for and received discretionary OSHRC review
 Cf. Todd Shipyards Corp. v. Secretary of Labor, 566 F.2d 1327, 1331 (9th Cir. 1977) (court of appeals precluded from considering due process challenge to particularity of charge due to failure to raise issue before OSHRC); GAF Corp. v. OSHRC, 183 U.S.App.D.C. 20, 25-26, 561 F.2d 913, 918-19 (1977) (court of appeals precluded from reaching issue of improper promulgation of regulation since not raised before OSHRC); and General Electric Co. v. OSHRC, 540 F.2d 67, 68 n. 1 (2d Cir. 1976) (court review limited to grounds upon which agency rested its decision).
 See generally Rothstein § 483.
 
 
 [22]
 See also Atlantic Steel Co., 1977-78 CCH OSHD P 22,483, 6 BNA OSHC 1289 (1978) And Great Falls Tribune Co., 1977-78 CCH OSHD P 21,844, 5 BNA OSHC 1443 (1977)
 
 
 [23]
 29 C.F.R. § 2200.73(a)
 See generally Rothstein § 418.
 
 
 [24]
 The OSHRC itself recognized this when, in subsequent proceedings in Continental Can Co., it held that the Secretary was not collaterally estopped to litigate economic feasibility despite his failure to raise the issue initially before the ALJ. The OSHRC realized that the Secretary did not fully litigate the matter since he did not then recognize his burden of proof. Continental Can Co., 1977-78 CCH OSHD P 22,491, 6 BNA OSHC 1184 (1977)
 
 
 [25]
 The only indication as to cost before the ALJ was the estimate given by the Secretary's expert as to the cost ($125,000) of the entire enclosure scheme which he recommended, but the ALJ modified this proposed scheme substantially so this estimate is not helpful. RMI has indicated the cost of the enclosures required by the ALJ, and the OSHRC, would exceed $100,000. But this representation was made in the form of an affidavit submitted in connection with a motion for a stay presented to this court. Reliance on this estimate, not subject to scrutiny by the Secretary, would also be inappropriate
 
 
 [26]
 We are clearly empowered to render this disposition by the following portion of 29 U.S.C. § 660(a):
 If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission, the court may order such additional evidence to be taken before the Commission and to be made a part of the record. The Commission may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive, and its recommendations, if any, for the modification or setting aside of its original order.
 We are willing to construe the relevant portions of the Secretary's brief to this court as an application "for leave to adduce additional evidence," for the reasons stated Supra regarding his failure to adduce such evidence initially. This clearly constitutes "reasonable grounds for the failure to adduce such evidence."